How much time would you like to reserve for rebuttal? Five minutes, please. Okay, well, let's proceed. Excuse me, before we begin, I was of the understanding that there was also going to be counsel for the other defendant in the case? Yes, for Henley, or Henney, yes. I think there was another name I saw on the screen. Okay, I just wanted to make sure. But I don't know, but they have not identified themselves, so we need them to identify themselves. Yes, we need to check. Mr. Levitsky, are you representing both defendants? He's coming in now, Justice. Mr. Gerken, you have to unmute yourself and identify yourself. Hello, Your Honor. Sorry for the technical difficulty there. My name is Christopher Gerken with Office of the State Appellate Defender here on behalf of Daniel Henney. Okay. And Justice Gordon, I am going to be representing the people on both issues as well. Thank you. Okay. May it please the court. I represent Mr. DeCorpo, and years before this incident took place, the fire in this case that resulted in Mr. DeCorpo and Mr. Henney's convictions, Mr. DeCorpo wrote an essay as part of his mental health treatment he was receiving in that time. And in that essay, he said, I blow up first and I listen later. That's me all right. If something even slightly gets me upset, I will just explode and not care whether I am right or wrong. I yell, shout curse words, hit walls, and throw things. When I get the punishment is when I listen to what was going on at first. After that, I feel a little stupid for making such a big deal out of something that is so stupid. Mr. DeCorpo couldn't have known it at the time, but when he wrote this, he really captured what Miller litigation is all about. Kids like Dino, like Mr. Henney, have brains that are different from any of ours. They're not yet developed and they are not capable of controlling their impulses. That is why when a person is sentenced for a childhood crime, they cannot be sentenced to die in prison unless they are permanently incorrigible. Life imprisonment is not for those whose crime reflects unfortunate, yet transient immaturity. It is only for the rare juvenile offender whose crime reflects irreparable corruption. And this court recently recognized in People v. Cazeta just a few weeks ago, that for a juvenile life sentence to pass constitutional muster, the circuit court must have necessarily found the defendant was irredeemably corrupt. Now, the trial court or the sentencing courts do not have to use the magical words irredeemably corrupt or permanently incorrigible, but they must make a determination that a defendant fits that description before they can sentence him to life imprisonment for a crime committed as a child or teenager. In this case, the sentencing court did not make such a determination. Quite to the contrary, the sentencing judge explicitly found that life imprisonment was not an appropriate sentence in this case, and that instead an appropriate sentence both for Dino and for his co-defendant would be a term of years. Now, unfortunately, when she did so, just like the judge in this court's recent decision in People v. Mahomes, she did not have the benefit of buffer. She did not know what the maximum turn of years allowable to not be considered a life sentence was, and that that was 40 years. So she sentenced him to a term of years in excess of 40 years. But the underlying finding was that life is not appropriate, and for that reason, Dino's sentence is unconstitutional. Now, the state recently filed... The court did make a distinction between the two defendants, though, did she not, in terms of culpability, or you say it didn't reach the irredeemability level, but she did make a distinction between the two, is that correct? Yes, she determined that Mr. Henney had done more to redeem himself than Mr. DeCorpo had, but she did not find that either of them were irredeemable. So while she determined that Mr. Henney deserved a lesser sentence than Mr. DeCorpo, she determined that both of them were not appropriate candidates for a life sentence. Now, regarding the Lesbi decision, the state filed a motion to cite it as additional authority, which this court granted, and we have no objection to the state citing Lesbi, but the problem with Lesbi is that it's not particularly relevant to the case before the court today for two primary reasons. The first is that, from a procedural perspective, Lesbi is wholly different from Mr. DeCorpo and Mr. Henney's cases. When Mr. DeCorpo and Mr. Henney were sentenced, this was after the court had decided Miller, Montgomery, Reyes, and even after the Illinois legislature had codified Miller in the Illinois statute, so the judge was well aware of what was required to sentence a child to life. On the other hand, in Lesbi and in Holman before it, those sentencing hearings occurred well before Miller was decided and were being reviewed in a post-conviction context, a successive post-conviction context, and the court was doing a backward-looking analysis to determine whether they could meet the cause and prejudice standard. That's simply not an issue in this case. But the more important distinction between Deno's case and between the Lesbi case and Holman case is mitigation. In both Lesbi and in Holman, the Supreme Court was very clear that the reason those defendants were not entitled to any sort of relief was because they had had the opportunity to present mitigating evidence, and they had chosen not to. Now, in Mr. DeCorpo's case, not only did he choose to present mitigating evidence, but he presented a mountain of it. As this court was now well aware after reviewing the record, we have a 316-page mitigation report that's in about 8-point font, so we have extensive details about Mr. DeCorpo's truly tragic upbringing and childhood, and I would be remiss to not at least briefly touch on some of those facts. Mr. DeCorpo was born premature and spent the first weeks of his life in an incubator, and his entire childhood was downhill from there. He was born to a teenage mother and a father who was dishonorably discharged from the Marines after going AWOL. Both of them became substantial drug addicts, addicted to both heroin and crack cocaine. They were homeless, and they moved from friend's house to friend's house with their children, exposing their children not only to their own as well. And the abuse did not end there. The abuse also became physical and emotional, as Dino's father brutally abused Dino, his younger siblings, and his mother, including countless incidents in the report, but just briefly two. One where Dino and his siblings were forced to stand outside in winter in their underwear because of some perceived slight, and another where Dino was kicked so that his sister cannot bear to look at her husband's steel-toed boots today. Eventually, Dino's father left when he was around 12 years old, but things still did not get better. He lived in abject poverty. There was never enough food. They were evicted regularly. His mother's health deteriorated, and so did his own. Dino found himself repeatedly institutionalized for doctors couldn't agree on a diagnosis. There was attention deficit disorder, a whole litany of mood disorders, and at one point even an organic brain disorder. But the one thing the doctors could agree on was that Dino could not control his impulses. Life continued to get worse. His mother was doing drugs with him when he wasn't in a facility, and the men that she married or dated afterwards continued the abuse. So when Dino was 16 or 17 years old, he finally had enough, and he moved out of the family home and lived with a friend around his age with no true adult supervision where they survived off of fast food and potato chips and cocaine. And the only sort of adult role models they had in life encouraged them to do things like steal to support themselves, and that is what Dino and Mr. Handy did on that day in the porch area of a residential building to try to steal something to make money. And there wasn't anything there of monetary value. So what did Dino do? Exactly what he described only two years earlier in his essay. He blew up. Something slightly got him upset, and he exploded and did not care whether he was right or wrong, and he lit a fire. And the consequences were catastrophic. A family was destroyed. But in all of these Miller cases, the consequences are catastrophic. If we're dealing with a Miller issue, we're dealing with a murder. We're dealing with a dead person and a family destroyed by that death. Whether the consequences were catastrophic is not the question, though. The question is, is Dino beyond redemption? The sentencing judge determined he was not and said that a life sentence was not appropriate. And furthermore, the scientific evidence shows that he's not. Dr. Hanlon testified at his sentencing and explicitly laid out the fact that while Dino had all of these brain issues and mental health issues as a child, by the time he was examined before sentencing, he had full executive function. He had an ability to control his impulses. He had no significant psychiatric problems and did not require psychiatric treatment for 15 years. That was Dino perfect? No. He's had tickets in jail. He's had fewer and fewer as time has gone on. He hasn't committed violent acts himself. He's gotten better despite all odds, despite a adult life in prison. That shows he is capable of redemption. And as such, his life sentence is improper. There are two possible remedies in this case. Either one, as this court did recently in People v. Hill, for purposes of judicial economy, it could simply reduce his aggregate sentence to 40 years. And the alternative, this court could reverse his sentence, remand for a sentencing hearing on all of the counts in front of a different judge. That is what we ask this court to do. If there are any questions. Does the panel have any questions? Let's proceed with the argument of the second defendant. I have no question. You're muted, Mr. Gerkey again. Thank you. Thank you, Your Honors. May it please the court. As I said, I represent Daniel Honey in this case on behalf of the state of health defender. When Daniel was 17 years old, he was committing petty crimes with Mr. DeCorpo burglaries when Mr. DeCorpo, not Daniel, impulsively and spontaneously set fire to some sheets that caused the tragic deaths in this case. For that, my client originally received a mandatory life sentence, plus an additional 30 years for aggravated arson based on the exact same conduct. After Villanueva v. Alabama, he was resentenced to 80 years. That sentence still violates the Eighth Amendment. Our Supreme Court's precedent and this court's precedent make this case, particularly with respect to Mr. Honey, fairly straightforward. As Your Honors know, in Miller and Montgomery, in Buffer and Holman, those courts hold that a juvenile offender cannot receive a life sentence unless their youth is properly considered under Miller and a determination is made, an accurate determination is made by the judge that they are permanently incorrigible. In this case, Your Honors, there's two questions this court has to answer with respect to Mr. Honey. First, did he receive a life sentence? The answer to that question is yes. And second, did the court determine that he's permanently incorrigible? The answer to that question, like it is with Mr. DeCorpo, is no. Mr. DeCorpo, I'm sorry, Mr. Honey received an 80-year sentence, which far exceeds the 40-year de facto lifeline set out in Peeble v. Buffer. And that sentence remains a de facto life sentence, even though he is technically eligible for day-for-day credit. Starting in Peeble v. Peacock and extending through a number of other cases, Illinois courts have repeatedly found that the number that the court considers in determining whether or not a sentence is a de facto life term is the actual sentence imposed, irrespective of day-for-day credit. I'll point out that in addition to Peacock, we have decisions in Thornton, in Daniel, which I believe Justice Hall concurred in, in Figueroa, which Justice Lamkin wrote and which Justice Gordon concurred in, as well as Hill and Cazada. Each of those cases found that a sentence between, sentences between 68 and 80 years, irrespective of de facto, irrespective of sentencing credit, was a de facto life term. And that rule makes sense. You know, good time credit is not guaranteed. It's entirely within IDOC's control. Credit can be lost for any rule violation, including minor or trivial rule violations. For example, Your Honors, my client, although thankfully he did not lose credit, he could have lost credit for violations such as trading another inmate for their egg salad sandwich, for having too many envelopes in his room. Those are things to receive violations for. And that those, the loss of credit is not even something that's really challengeable on appeal because it's entirely within IDOC's control. So where Miller and those cases require the consideration of youth at a sentencing hearing, a determination of places those determinations basically within IDOC's control. And I'll point out that in particular with respect to Mr. Henney's sentence, the loss of even one day will cement a sentence over 40 years, which is certainly over the 40 year de facto lifeline. And therefore, with respect to the first question, we asked this court and Your Honors to follow the decisions that you've already made in other cases, follow Peacock, Thornton, Daniel, Figueroa, Hill, and find that Mr. Henney's 80 year sentence is a de facto life term. Now, because he has a de facto life term, he cannot receive a life sentence unless he's permanently incorrigible. As the U.S. Supreme Court held in Montgomery, even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects unfortunate yet transient immaturity. And therefore, and in Holman, the Supreme Court made the same holding, there has to be a determination of permanent incorrigibility. And as Ms. Mason said, in this case, not only do we not have that determination, we have affirmative statements by the judge that both Mr. DeCorpo and Mr. Henney were not permanently incorrigible, that they did not deserve a life sentence. The judge in this case specifically recognized that it was permitted to give a life sentence for a defendant that and even defined the word incorrigible correctly as a person not able to be corrected, improved, or reformed. Yet the court said, quote, but I think the appropriate sentence in this case for these two defendants are a term of years rather than a sentence of natural life. So the court is specifically rejecting, as Ms. Mason said, rejecting the idea that these defendants deserve a life sentence. And in addition, particularly with respect to Mr. Henney, the court found, quote, he had demonstrated his ability to change and that, quote, he had done more to rehabilitate himself in custody than most do. Again, this is not a case where there's an absence of a statement with respect to permanent incorrigibility with respect to rehabilitative potential. This is a case where the court affirmatively found that these defendants are not permanently incorrigible effectively, although it didn't use those words. And that was an accurate determination in this case, particularly with respect to Mr. Henney. Again, Mr. Henney was a 17-year-old special education student with a drug addiction. He was following Mr. DeCorpo's lead, committing petty crimes on the day in question, and he's not the one that set the fire. Mr. DeCorpo did. And Mr. DeCorpo, actually in 2016, when he spoke to the psychiatrist, the Northwestern psychiatrist that spoke at trial, he admitted to the psychiatrist that he alone was the one that set the fire. He reiterated that and said that Mr. Henney actually tried to stop the fire from being set unsuccessfully. So in addition to having a very low moral culpability for the fire that was set in this case, Mr. Henney has also shown significant rehabilitative potential, as the court recognized, which I'll point out that the state does not dispute really anywhere in their briefs. Briefly, Your Honors, Mr. Henney made a statement in allocution as a young man at the original sentencing hearing, where he was guaranteed a mandatory life sentence no matter what he said. And even at that point, he still chose to apologize to the family for what happened and for his role in that. Over the next 20 years of incarceration, there's not quite as an extensive mitigation packet as Mr. DeCorpo, but what it does show is that he kept in very close contact with his family and his young nieces and nephews. He attended in the prison and jail. He attended school, church, self-health groups, trainings, classes. There's a bunch of certificates in the record. He acted as a mentor to younger inmates. He worked in the kitchen. And again, much of this was at a time when he believed that he would never be released from prison. This is before Miller v. Alabama, much of this conduct. He also received letters of support from a retired correctional officer and from a minister, attesting to his ability to become a productive member of society again. And then again, at the second sentencing hearing, he again apologized for his role and again apologized to Ms. Poole for what happened to her family. And in any case, Your Honors, again, the court specifically found that a license was inappropriate and that Mr. Henney had demonstrated his rehabilitation. And therefore, the answer to the questions posed by this case is very clear. Because he received, because Mr. Henney received a de facto life sentence and because the court specifically found, although not in so many words, that he was not permanently incorrigible. He was not forever incapable of rehabilitation. Quite the opposite. His sentence is unconstitutional. And therefore, we'd repeat the two remedy options that Ms. Mason pointed out. First, as this court did in People v. Hill, although we didn't ask for it, we'd point out to the court that they had the option of, in the interest of judicial economy, because this record is fairly laid out as far as the mitigating factors in this case. It could just reduce Mr. Henney's sentence itself to 40 years or it could remand for a new sentencing hearing. If Your Honors have any other questions, I'd be happy to answer them. Any questions by the panel? I don't have any. Mrs. Hall? I have no questions. Thank you. Okay. Let's hear from the state. Good morning again, Your Honors. And may it please the court, Assistant State's Attorney Brian Levitsky. I'm sorry? Assistant State's Attorney Brian Levitsky on behalf of the people. I wanted to start out by noting we cited Daryl Dorsey in our brief, noting that it's potentially dispositive of the application of good time credit to Henney's 80-year sentence. I don't have any updates on that case. I know that the petition for leave to appeal was allowed in late March. I anticipate because of COVID they were still in the briefing stage, but I cannot project when we might have a decision in that case. So I'll turn to what I do have. Your Honors, the sentencing court in this case made a decision after conducting a thorough and comprehensive hearing, which the court specifically ordered to ensure that the defendant's sentences would conform to Miller and his progeny. Both of these defendants, the corporal and Henney, had an opportunity to present evidence indicative of their rehabilitative potential. They both submitted mitigation packets, which we heard about from their attorneys just now. Also, as DeCorpo's attorney noted, he called his psychologist. The court also had before it their history of any tickets that they had received in jail, which also showed after the fact what the rehabilitative actuality was. After considering all this evidence, the court explicitly or implicitly considered the Miller factors regarding DeCorpo. It found that the defendant DeCorpo essentially did not have rehabilitative potential and therefore properly exercised his discretion in imposing a 90-year sentence. Now, right off the bat, I wanted to address something that both attorneys had noted, is that the court specifically did not, after discussing the definition of incorrigibility, did not want to impose a natural life sentence for both defendants. But another thing that the court considered in that was that the cost to the family and to the parties in producing this sentencing hearing and having to relive these horrific events was too great. I think what happened was the court was reading the tea leaves and trying to predict the direction that the Miller cases were heading in and said, we're going to impose a term of years because there may be a future court case that says no juvenile defendant can receive any natural life sentence. I think that actually explains why the court imposed the 80 and 90-year term of year sentences as opposed to it making some implicit finding that neither defendant was incorrigible. I'd ask the court to look again at those comments that the court made in the sentencing hearing because I don't think it actually supports the conclusion that the defendants are asking this court to find. Let me ask you this. How do you get around buffer? How do you get around buffer? Buffer, I think, applies more to Henny. I'll jump to that. Of course, the court is familiar with our arguments regarding Patterson and Reyes, looking at the earliest opportunity of release and looking at good time credit when discussing a life sentence. We contend that Evans was correctly decided and that Peacock was incorrectly decided. I know this court is familiar with those arguments. Just very briefly, Evans noted that the defendant was eligible for day-for-day credit such that he would be released after 45 years of his sentence in that case. The focus of the decision wasn't on the fact that he'd be released after 45 years of sentence. It was the possibility of parole rather than the length of the sentence is what mattered. The court said this alone takes Evans out of the Miller category since he's not serving a sentence without the possibility of parole. Now, when this court distinguishes Evans, it typically looks at that 45-year line and says, well, because of the buffer, we know that 45 is over 40. Therefore, that somehow diminishes the persuasive weight of Evans. If you look at the case, it's actually more consistent with Miller and Montgomery than Peacock is. What Peacock says is, we just don't trust that IDOC is actually going to award day-for-day credit. What Miller and what Montgomery said is that all a defendant needs is a meaningful opportunity to have a release before a natural life sentence. What it suggested was that the defendants receive something like a parole hearing. I think in Montgomery, the court said that that would actually cure potential Miller violations if the state would just give these parole hearings. Well, good time credit is something that the defendant essentially holds onto. As it's been noted, both of these defendants are receiving good time credit. As far as Hennie, I just want to note that the offense in this case occurred September 14th, 97. He was arrested according to the indictment information sheet on December 22nd, 97. His projected parole date is July 31st, 37. Right now, not only is he getting good time credit, but he's actually getting so much that it's going to be serving less than 40 years to the tune of five months. I think that what Peacock was concerned about was it's not guaranteed that a defendant is going to get this good time credit. It looks at the different rules and regulations that are in place, the formal hearing, the fact that the defendant doesn't have a representation there, but also the fact that it has to be a formal hearing. It's not just any ticket. It has to be a significant ticket, which is why Hennie talked about the tickets that he had received, but in fact, has still not lost any credit. I know it's not just things like the egg salad sandwich that he was holding. I think there was a bit of a city that held onto or something like that, but he also had more significant tickets as well. We presented at the sentencing hearing that in 2000 and in 2001, he was actually engaged in fighting. I think in one of those cases, at least he said that it was self-defense, but even for fighting, he did not lose a single day good time credit. The sum and total of all of this is that these defendants were arrested for a crime that took place in 1997. If their sentences were actually reduced to 40 years with good time credit, then they would have been eligible for a lease almost three years ago, just to put this into a little bit more perspective. I did want to address a few more things about DeCorpo that were mentioned by his attorney. Lusby does stand for the proposition essentially that no magic words are required. That's something that both of the parties agreed on. They were in that case, but I think that defendants attempt to distinguish Lusby by noting its procedural differences, amount to a distinction without a difference. Yes, in Lusby and in Holman, the sentencing hearing occurred before Miller, but all that means is that the judge in this case had the benefit of Miller and its progeny, excluding Buffer certainly, in determining whether or not the defendants had demonstrated evidence of their rehabilitative potential. Like in Lusby and the question is not, did the court make these specific findings? It's, did the defendants have an opportunity, a meaningful opportunity to present evidence indicative of showing that this offense was a product of their impetuousness of youth rather than their own permanent incorrigibility. I think just like in those cases, what we have, at least as far as DeCorpo is concerned, is that he did not present that evidence, even with the benefit of being able to present this mitigation evidence. Again, he was before the court, which was familiar with everything that defendant presented. And like so many cases where a defendant argues that the court didn't consider mitigation evidence, the question is whether there's anything in the record, you know, that rebuts the presumption affirmatively that the court did consider that. And we don't have it. The court commented on the mitigation evidence at length. It's still made findings that as far as Henney is concerned, I'm sorry, as far as DeCorpo was concerned, that a 90-year sentence was appropriate. And also the fact that it took Miller very seriously. I know that in the brief... Okay, sorry. I just had to stop you for one second there. You said you thought the judge took Miller very seriously. Correct. In her remarks in this case, when it seems to me more that she was dismissive of Miller and saying that a juvenile's brain was different than an adult's brain and that they were not mature, that they were more impetuous. To me, it seemed like she just kicked aside what Miller was saying about what she should consider. And it seemed to me that she was more... And I mean, I can't doubt her. I guess I said I can't challenge her. This is a horrendous, horrendous result of somebody lighting a sheep on fire, which the judge agreed was not intentional. But it didn't seem to me from what I read that she was saying that either of these young men were incorrigible. It seemed like she wasn't giving sufficient weight to what I consider an unbelievably horrendous, chaotic life that Mr... I can't think of his name. I can't say it. It's the young man who got the 90-year sentence. It was painful to read his background. And it seemed to me more like the judge was saying he had a background, but his sisters did... I mean, his sisters were fine, so we're going to ignore his background and give him a 90-year sentence. So I wanted... I want you to tell me how you read that this judge found this young man who was 17 as, what is it, incorrigible, and that he needed to be locked up for what amount to his natural life. And I also, because no one said that, but in reading the judge's statement, I heard her talk about his background. Did he actually have juvenile findings of delinquency? I don't remember reading what they were, just statements that there were some issues in his background. If you can tell me the... So as to the second question first, I do recall reading something about that, but I apologize. Off the top of my head, I don't recall, and I don't have any notes as to what they were. I don't recall that it was anything particularly serious, but anything that's inconsistent with counsel's representation that he was essentially stealing to support himself, you know, crimes of survival like that. But as to the first question, thank you for bringing it up. I wanted to mention it because I anticipate that it's something the attorneys might rely on to reply. So what we have here is a judge who I think was very familiar with Miller. Not only did she cite the factors, but she also said that she actually went back and she read the journal articles that explained the developing nature of juvenile brains. And so this is someone who's not simply, you know, looking at the specific matter to the court of what are the factors, but is trying to understand the rationale behind it and trying to understand the scientific basis that supports it. So I think that's a judge who's actually going a little bit beyond, you know, what's, you know, maybe required. And she did specifically cite the factors. Now, let's take, for example, when she says that she doesn't like referring to the defendants as children. I think that what she was doing was she was noting that these were individuals who were, I think, three months shy of turning 18. And so she said that, you know, for that reason, she felt this sort of incongruity between referring to them as children compared to so many other Miller cases, whereas you might have a 14 or 15 year old defendant. But she still said that, you know, that's the law. And so that's the way I'm going to treat them. And so I think what you have is a judge. Yes. I wish she had said what you said. She didn't say she was going to treat them like children. She was having a very difficult time, I think, stomaching the fact that they weren't treated like an adult because she said something like, she knows they're teenagers who are more mature than adults. I don't know. That's, I mean, that's another side of it. I think I'm strong. Again, but yeah, I'm going to read this again. But it was it just her comments disturbed me. Right. So I guess just in summary, my reading of it is that she, you know, recognized that I think as the court in Graham said that, you know, sometimes you're going to have those, you know, people who are under the age of 18 who are as mature as they're ever going to be. And sometimes you have people over the age of 18 who are never going to reach maturity, but we draw the line at 18. And so I think that she was recognizing that insight from the United States Supreme Court and, you know, making those comments in this case. But that doesn't show to that she affirmatively did, you know, refused to apply Miller. Again, the reason for the hearing was because these defendants had filed post conviction petitions for a hearing so that their sentences would conform with Miller. And so I think that's what it was on everyone's mind. That's why the court cited the factors and applied them. And again, with respect to DeCarpo's mitigation evidence, there was a lot in there relating to his youth. But, you know, the question is, does it show that the crime was a product of youthful immaturity? And I think that what the judge was looking at was, you know, we have evidence here, but it doesn't show that, you know, that it relates to that specific component of Miller. What it shows is that this is a defendant who's never going to be able to conform himself to the law. This is a defendant who's going to become a recidivist offender, you know, the moment that he's locked out of jail. And so I think that's what the court had in mind when it was reviewing the evidence. But again, I would commend the court to just look at this sentencing hearing because the court did explain its comments at length, as I recall. The last thing I want to say about DeCarpo, because both attorneys mentioned it, he says that he, you know, took personal responsibility for the fire, but he did so to a mitigation expert shortly before the resentencing hearing occurred. So I think that that's something also that the court noted is that, you know, the defendant's evidence of rehabilitation in jail, at least, occurred after, you know, some time had passed. And some of it may have been related more to the fact that he simply wanted to have evidence to present to a court rather than revealing who he was as a person. With regards to Penny, again, I just wanted to point out, as this court's familiar with these arguments, it's not the case, as counsel would have it, that it's entirely within IDOC's control that an individual is, you know, can have their time credit revoked. Again, that's not even the question. The question is whether or not he's got a meaningful opportunity in a system which guarantees him day-for-day credit, absent significant violations of, you know, jail or prison procedures, certainly fits the mold of what Miller and Montgomery were saying when they said that these, you know, potential violations could be cured simply with a parole hearing, where it's also not guaranteed that someone could be released, and there's also significant hurdles that have to be overcome. And so we would reiterate our position in these cases and so many others this court has seen that Evans was correctly decided and that Peacock was incorrectly decided. Let me ask you this. Have you abandoned your argument on forfeiture? Oh, the, are you talking about when Hennie's attorney asked for a 40-year sentence? Unknown caller. I'm sorry, are you asking about the, when defendant Hennie's attorney asked for a 40-year sentence? In your brief, you had an argument on forfeiture. Have you abandoned that? Uh, I'm, I'm sorry, with respect to which argument? Justice Gordon, he's asking, are you talking about which, which defendant? Is it the Hennie argument or the Hennie withdrawal of the PC? Yes. Let's just forget it. Yeah. For these reasons, if there are no further questions, then for these reasons, and those stated in our brief, we would ask this court to affirm both sentences. And again, we would note that defendants' new argument regarding early release would essentially mean that the defendants would only serve, and the court essentially only have the discretion to impose a sentence of 20 years, and they would be eligible for release now. Thank you. Okay, rebuttal. May it please the court. There are just a couple of quick issues I would like to discuss. First, Justice Gordon, I would like to get back to the question you asked the state, how do they get around a buffer? They don't. It's that simple. These sentences are in excess of 40 years. The judge said a life sentence was not appropriate. That's really all we need to discuss here today. Game over. But then I would also like to get back to Justice Lampkin's questions about the information regarding Mr. DeCorpo's background, and Justice Lampkin touched on something important, the judge's comments about Dino's sisters, and the judge's comments that, yes, Dino had a bad background, but his sisters grew up in the same environment, and they turned out okay, completely discounting the horrific upbringing that Dino had, but I think more importantly, discounting that Dino's sisters were not okay. As I detailed in the briefs, they also had substantial difficulties as teenagers, were in trouble with the law, you know, involvements with older men. One of them wound up herself being institutionalized for a while. It was only after they grew up, their brains developed, and fortunately, they weren't in the Department of Corrections that they were able to turn their lives around. And those are the kinds of facts that, you know, I don't believe that this judge set out with the intent to not follow Miller. I think she tried really hard. But ultimately, at the end of the day, she didn't do it. It was too hard for her to overcome those preconceived notions about whether a 17-year-old should be treated as a child. And that's why if this court does choose to remand for a different sentencing hearing, as opposed to just reducing the sentence to 40 years, we ask that a different judge be assigned to that sentencing hearing. But finally, I would like to get back to one of the very first things that the state's attorney brought up. And he talked about how this sentencing hearing was sufficient because it was a detailed hearing where we heard all of these, you know, but that's simply not the law. I would direct this court to its very recent decision. Miss Mason, would you speak a little further on why you think we should send this case to a different judge? Yes. I mean, I think the best remedy in this case would be to just reduce the sentence to 40 years for judicial economy purposes. But if this court does determine that a new a lot of what Justice Lamkin touched on in her comments to the state is why we should have a different judge in this case. This judge was well aware of the law regarding Miller. She wasn't in the same position as the judges in Lusby or Holman were in. She knew about Miller. She even said she had read the studies in Miller. And yet despite that, despite her best efforts, she could not apply Miller. She could not treat Dino and Mr. Henney as child offenders. She could not give the mitigating evidence, the factors attendant to their youth, the mitigating value that they deserve. And so because she was not up to that task, it's she's a human being. It's one thing that she was not capable of doing. A different judge would be better if there were new sentencing hearing to best ensure that Miller is in fact followed. So briefly, in one last concluding point, the state argues that this hearing was sufficient. However, is this court recognized in the homes? It's not enough that the factors merely be talked about. Instead, they have to be treated as mitigating. And in light of buffer where there's not a finding of the necessity of a life sentence, any sentence over 40 years requires an adjustment. And for these reasons and all the reasons in the briefs, we ask either that this court vacate the sentence and reduce the sentence to an aggregate term of 40 years or in the alternative remand for a new sentencing hearing before a different judge. Let's hear from the second defendant. Thank you, your honors. May it please the court. Just a few points with respect to the peacock issue. Opposing counsel asked this court to follow people versus Evans. I'll point out that the Illinois Supreme Court and and people versus buffer specifically abrogated Evans and this court. And I believe justices on this very panel, Justice Gordon, Justice Lampkin in particular, and Figueroa, I think, expressly rejected the same exact argument that is being made here. I'll also point out that as people versus Hill recently decided, in the case we cited as additional authority, buffer itself was concerned with the actual sentence imposed. It rejected the state's arguments about survivability and when a person would be released from prison. I'll also point out that Mr. Levitsky made a point of will get every single day of pre-sentence credit to which he is eligible. Good conduct credit for which he's eligible. But he also pointed out that you have to have a really serious violation. And while that might be the case, that might be the case, if you actually look at the law, it's a good time to be taken for any violation. It's totally within IDOC's discretion. Certain prisons may have different practices about the level of violation that has to occur. Any violation can result in the loss of good time. And in addition, I'll reiterate, this problem is particularly acute for Mr. Henney because he has an 80-year sentence. And so, the earliest possibility that he has for release is right at 40 years. So, if he loses even a day of good time, again, from now for the next 20 years, he'll certainly have a cemented life and therefore, and that determination will not be made necessarily based on his, you know, getting characteristics of his youth at sentencing or whether or not he's permanently incorrigible. It'll be based on a rule violation in IDOC. So, and again, he only needs, again, only a day of losing that time will do that. So, I'm going to reiterate, I'll ask this court to follow its precedent. There's been no published case that's disagreed with Peacock. And I'll point out too, Mr. Policing Counsel pointed out Peeble v. Dorsey. The Dorsey case was actually written by Justice McBride before Buffer and Holman came out. And I'll point out to that, Justice McBride was the author of the Peacock decision. So, I think that's something to consider as well. As far as Peeble v. Lesby is concerned, I just wanted to touch on that because I neglected to address it earlier. Lesby didn't change really anything. Lesby was just an application of Miller, of Buffer and Holman. You know, Lesby itself reiterated the same findings of Holman saying you have to make a determination of permanent incorrigibility, although there are no magic words. It said, quote, courts must, quote, make an informed decision based on the totality of the circumstances that the defendant was incorrigible and that a life sentence was appropriate. And in that case, the facts were vastly different. You know, unlike, sort of, the impulsive setting of a fire due to frustration at a burglary by, you know, a juvenile offender with some mental health problems and my client who accompanied him. In that case, you know, the court specifically found the victim was terrorized, sexually assaulted, and humiliated and executed in her own home. The court made a finding that the defendant in that case performed, quote, a clearly depraved act and, quote, he had absolutely no respect for human life. And the court specifically found in that Lesby case that it was, quote, not at all uncomfortable in imposing the maximum sentence. So even in the Lesby case, I think it's implicit in the court's determination that they determined that the defense there were permanently incorrigible. And that's not, just not what happened here. You know, I know Mr. Levitsky is asking your honors to go back and look at the context of some of the statements about why you imposed a term of years, but I'll reiterate that if you look at, if you look at those comments, the judge there specifically said, I can impose a life sentence and I can only do it if I find you incorrigible, but I'm not going to impose a life sentence. I think it's just implicit from that, that they found the defense were not incorrigible. And that doesn't even speak to the specific comments about my client's proven rehabilitation in that case. And just one final point is that opposing counsel mentioned, you know, the court considered Miller factors. And I think Ms. Mason spoke to, and Justice Lamkin spoke to how the justice might have misconstrued or not fully applied those factors. But I also point out that we made several arguments or I made several arguments in my report, how the court actually misapplied those factors or failed to apply them. Just I'll point out one in particular with respect to my, to my client, while the court specifically credited Mr. DeCorpo's statement that he's the one that set the fire, the court made comments immediately before sentencing, referring to it as their conduct, their actions saying that they let the match where obviously my client's not the one that set the fire. He found that the deaths were not induced or facilitated by someone other than my client. He found that there was no peer pressure, which of course is exactly contrary to the evidence in this case. In addition, it found that my client was quote responsible for the results of the fire because he should have been quote mindful of the consequences of the fire. But of course, we know from Miller and Buffer and Montgomery in these cases that quote immaturity, impetuosity, and the failure to appreciate risks and consequences are hallmark features of youth. So what that shows your honors, that's just an illustration of the fact that the court, while I agree with Ms. Mason, that he was trying to apply Miller correctly, it did not do so. It either failed to properly consider Miller factors or considered certain mitigating factors that as aggravating instead of mitigating. And therefore your honors, because my client received a de facto life sentence and because he was not permanently incorrigible and because the court improperly considered Miller factors, we respectfully request that you either follow Hill and reduce my client's sentence or remand for new sentencing hearing. Thank you. Thank you both for giving us an interesting case and some good oral arguments and you'll shortly have a decision in this case, either an opinion or an order very shortly. Thank you very much. And the court will be adjourned, but the justices will stay.